**Braxston Lee BANKS, Plaintiff,**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and University of Notre Dame, Defendants.**

**No. S90–394.**

United States District Court,
N.D. Indiana,
South Bend Division.

Aug. 17, 1990.

Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., James A. Masters, Joseph S. Donnelly, South Bend, Ind., for plaintiff.

John J. Kitchin, Kansas City, Mo., William C. Bernard, Gayle A. Reindl, Debra M. Lynch, Indianapolis, Ind., for National Collegiate Athletic Ass'n.

Phillip J. Faccenda, Gerald F. Lutkus, South Bend, Ind., for University of Notre Dame.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This cause came before the court on August 16, 1990 for hearing on the motion of plaintiff Braxston Banks for a temporary injunction. Mr. Banks seeks injunctive relief against the National Collegiate Athletic Association ("NCAA") and the University of Notre Dame to restore his eligibility to play intercollegiate football for Notre Dame during the 1990 season. Without injunctive relief, he will be ineligible to play because he entered the National Football League ("NFL") draft and was represented by an attorney in his dealings with NFL teams; NCAA rules deem a person who has done such things a professional and ineligible to play amateur intercollegiate football. For the reasons that follow, the court concludes that Mr. Banks has not shown any likelihood of success on his contention that the NCAA rules violate § 1 of the Sherman Antitrust Act. Without such a showing, no preliminary injunction can be issued.

This memorandum is intended to comply with the requirements of Federal Rule of

Civil Procedure 52(a) concerning findings of fact and conclusions of law.

## I.

The NCAA is a private, voluntary, unincorporated association of approximately 1,017 members, consisting of colleges and universities (including Notre Dame), conferences and associations, and other education institutions. According to the NCAA constitution, the NCAA's purpose is to promote intercollegiate athletics in the United States and to maintain amateur intercollegiate athletics "as an integral part of the educational program and the athlete as an integral part of the student body and by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports." Approximately 187 colleges that play intercollegiate football are members of the NCAA. It is the dominant association of colleges and universities that engage in intercollegiate athletics.

The NCAA Bylaws constitute rules regarding all intercollegiate athletics, including football, to which all members are required to adhere and which the NCAA enforces. Among those rules is Bylaw 12.2.-4.2 (the "no draft" rule), which makes an athlete ineligible for further intercollegiate play in any sport in which he or she has placed his name in the professional draft, even if the athlete asks that his or her name be withdrawn from the draft list, or the athlete is not drafted, or the athlete does not sign an agreement with a professional team.[1]

Another provision, Bylaw 12.3 (the "no agent" rule), makes an individual who agrees to be represented by an agent (including an attorney) to market the player's services ineligible for further intercollegiate play in the sport, even if the player accepts no money or other thing of value from the agent.[2]

NCAA officials are giving serious consideration to modification of the "no draft" rule, but no modification of the rule could occur before the NCAA's annual convention in 1991. No proposals to amend the "no draft" rule at that convention have been filed to date. Nothing in the record suggests that NCAA officials are considering modification of the "no agent" rule.

The NCAA Bylaws also contain a provision, 14.14, which sets out a procedure by which a member institution such a Notre Dame (but not the student-athlete) can petition the NCAA to restore a student-athlete's eligibility.[3]

---

1. Bylaw 12.2.4.2 provides:
An individual loses amateur status in a particular sport when the individual asks to be placed on the draft list or supplemental draft list of a professional league in that sport, even though:
(a) The individual asks that his or her name be withdrawn from the draft list prior to the actual draft,
(b) The individual's name remains on the list but he or she is not drafted, or
(c) The individual is drafted but does not sign an agreement with any professional athletics team.

2. Bylaw 12.3 provides:
12.3.1 General Rule. An individual shall be ineligible for participation in an intercollegiate sport if he or she ever has agreed (orally or in writing) to be represented by an agent for the purpose of marketing his or her athletics ability or reputation in that sport. Further, an agency contract not specifically limited in writing to a sport or particular sports shall be deemed applicable to all sports and the individual shall be ineligible to participate in any sport.
12.3.2. Legal counsel. Securing advice from a lawyer concerning a proposed professional sports contract shall not be considered contracting for representation by an agent under this rule, unless the lawyer also represents the student-athlete in negotiations for such a contract.
12.3.2.1 Presence of a Lawyer at Negotiations. A lawyer may not be present during discussion of a contract offer with a professional organization or have any direct contact (i.e., in person, by telephone or by mail) with a professional sports organization on behalf of the student-athlete. A lawyer's presence during such discussions is considered representation by an agent.

3. Bylaw 14.14.1 provides:
14.14.1 Basis for Appeal. When a student-athlete is determined to be ineligible under any applicable provision of the constitution, bylaws or other regulations of the Association, the member institution, having applied the applicable rule and having withheld the student-athlete from all intercollegiate competition, may appeal to the Eligibility Committee for restoration of the student's eligibility, provided the institution concludes that the circumstances warrant restoration of eligibility.

## A.

The facts are not in substantial dispute. Braxston Lee Banks entered the University of Notre Dame as a student-athlete in September, 1986 on a full grant-in-aid, which is worth approximately $16,000.00 per year. He played football for Notre Dame during the 1986–88 seasons.

Mr. Banks played all eleven games for Notre Dame during his freshman year, starting four or five. In his sophomore year, he injured his knee in the opening game and played in only seven games. Largely because of his knee injury, he again played in only seven games during his junior year. He started four games in each of those seasons. Although the Notre Dame football trainer released him to full activity in June, 1989, Mr. Banks sat out the 1989 college football season—his senior year—in the hopes of assuring his knee's full recovery.

Having played three seasons and missed one season due to injury, Mr. Banks was eligible to play one more year of intercollegiate football, but because eligibility lasts for only five years after enrollment, that year would have to be 1990. Because his class would graduate in 1990, however, Mr. Banks also had, under then-existing NFL rules, the option of entering the NFL selection process, or "draft". The NCAA's "no draft" rule would not allow him to do both. In December, 1989, Mr. Banks began what obviously was a time of hesitation and indecision.

Mr. Banks discussed his options with his family and friends, including several former Notre Dame football coaches who were then coaching in the professional ranks. He also discussed the matter with Everett Glenn, a family friend and sports attorney, who had once advised Mr. Banks on another sports matter when Mr. Banks was in high school. At Mr. Glenn's suggestion, he contacted the "scouting combines" that work directly for NFL teams in evaluating players.[4] He was told that he

was a "rated" player (meaning that had he completed his college eligibility, he would have been invited to be scouted) and that he should be drafted.

Still, Mr. Banks had doubts about whether he would be drafted. His classmate, Anthony Johnson, was expected to be chosen early in the NFL draft. While he had started ahead of Mr. Johnson in some games before his injury, Mr. Banks knew his knee injury might make NFL teams chary of drafting him.

In February, 1990, still uncertain, Mr. Banks applied to Notre Dame to continue his education for a fifth year and to renew his grant-in-aid. Notre Dame orally approved his application, which would have enabled him to play football for Notre Dame during the 1990 season.

In March, 1990, however, Mr. Banks decided to enter the 1990 National Football League draft and signed the form required by the NFL for draft eligibility. Indeed, he actually signed the form twice. His signature was not notarized on the first form, which the NFL received on or about March 13, 1990. The NFL received a second, properly notarized, form on or about March 20, 1990. He reports that at some point he changed his mind about entering the draft and called the NFL to ask that his petition be disregarded. He was told to send a letter. He changed his mind again and left his petition on file.

Both forms required Mr. Banks to sign immediately below a paragraph that read, "I HEREBY IRREVOCABLY RENOUNCE ANY AND ALL REMAINING COLLEGE ELIGIBILITY I MAY HAVE. I WISH TO BE ELIGIBLE FOR THE NFL DRAFT SCHEDULED FOR APRIL 22–23, 1990."

By placing his name in the 1990 NFL draft, Mr. Banks lost his amateur status for football and, hence, became ineligible to play intercollegiate football by virtue of NCAA Bylaw 12.2.4, the "no draft" rule. The language on the NFL form did not

---

**4.** This contact would not appear to have rendered Mr. Banks ineligible for further intercollegiate football participation.

NCAA Bylaw 12.2.4.1 provides:

Inquiry. An individual may inquire about eligibility for a professional-league player draft without affecting his or her amateur status.

make him ineligible; the NCAA Bylaw did. The parties agree that principles of contract law are not at issue in this case.

### B.

After deciding to enter the draft, Mr. Banks contacted NFL teams through Mr. Glenn. Although he had no oral or written contract with Mr. Glenn or any other agent or attorney to represent him in marketing his athletic ability or reputation before entering the 1990 NFL draft, he entered an oral argument with Mr. Glenn after deciding to enter the draft, and Mr. Glenn tried to market Mr. Banks' services. Mr. Glenn sent the following letter to all twenty-eight NFL teams:

> Please be advised that this office will represent Braxston Banks in the upcoming NFL draft. As a fifth-year senior who will receive his bachelor's degree in May, Braxston has petitioned the NFL and been cleared to be included in the upcoming draft.
>
> For the record, Braxston is 6'3", 235 lbs. (not 215 lbs. per 1989 info of BLESTO [a scouting service]) and recently ran a 4.5 for an NFL scout. It is also noted that Braxston started for two years at Notre Dame ahead of the player rated by many observers as the top fullback prospect in the draft.
>
> According to Mr. Butler of BLESTO, Braxston will be invited to participate in the April 6-7 workouts. We trust that you will take the time to visit with Braxston to satisfy yourself about Braxston's physical condition and to otherwise update his file.
>
> Thanks in advance for your consideration.

Mr. Banks received no compensation or other thing of value from Mr. Glenn or any other agent or attorney. Nonetheless, by agreeing to have Mr. Glenn market his athletic ability in football, the NCAA "no agent" rule, Bylaw 12.3, rendered him ineligible, on a second basis, to play intercollegiate football.

After he placed his name in the draft, Mr. Banks was contacted and tested at Notre Dame by representatives of virtually all NFL teams, and he attended an NFL tryout in Indianapolis with other college players who had entered the draft before completing their college eligibility. At that trial he did not perform as well as he had in the past, especially in the 40 yard dash. Mr. Banks attributes this to the cold weather, lack of adequate warm-up, and his decision (because the tryout was conducted on artificial turf) to wear a knee brace that ran from his thigh to his ankle and that apparently concerned the professional scouts. Only two NFL teams contacted him after the Indianapolis tryout.

Mr. Banks was not chosen in the draft. That misfortune rendered him a "rookie free agent" in the eyes of the NFL, meaning that he was free to contract with any of the twenty-eight NFL teams.[5] No professional team offered him a free agent contract, although he travelled to Pittsburgh for a post-draft tryout. He thought he did well in Pittsburgh, but the coaches told him they already had the maximum permissible number of players under contract.[6] Mr. Banks received nothing from the Pittsburgh team other than his airplane ticket to fly to and from Pittsburgh.

Mr. Banks completed the requirements for his degree at Notre Dame during the summer semester of 1990 and graduated from Notre Dame with a Bachelor of Arts degree in English in August 1990.

### C.

As of today, Mr. Banks has never signed a contract with any professional football team and has never received any compensation from any professional team, although he received travel reimbursement for the tryout in Indianapolis and a round trip

---

5. The record also reflects the existence of the Canadian Football League ("CFL"), which is comprised of nine teams. Whether Mr. Banks could have applied for employment with a CFL team is not apparent from the record.

6. An NFL team may have as many as eighty players under contract at any one time during the off-season. Each team must reduce its roster to sixty players by August 28, 1990 and to forty-seven players by September 3, 1990.

plane ticket to fly to Pittsburgh for his tryout.

As a result of Bylaws 12.2.4 and 12.3, the NCAA considers Mr. Banks to be ineligible to play football for any NCAA institution. Any NCAA institution that allowed him to play would be subject to serious penalties by the NCAA. Despite the procedure made available by NCAA Bylaw 14.14, Notre Dame has declined to seek restoration of Mr. Banks' eligibility. Mr. Banks attempted in June and July to request the NCAA to restore his eligibility, but the NCAA indicated it would consider only a request from Notre Dame, the member institution.

The NCAA has taken no steps to discipline Mr. Banks; other than declining to consider his application for restoration of his eligibility, the NCAA has taken no action toward Mr. Banks whatsoever. Notre Dame, however, as a member of the NCAA, is expected to enforce the NCAA's eligibility requirements.

Mr. Banks wants to return to Notre Dame to continue his education, to play football again for Notre Dame, and to prove to the NFL teams that his knee is well enough to play professional football. But for his ineligibility based on Bylaws 12.2.4 and 12.3, Notre Dame would admit Mr. Banks for a fifth year of academic study, renew his full grant-in-aid, and permit him to play football again. Notre Dame will not renew his full grant-in-aid unless he is eligible to play football. Football practice begins at Notre Dame on August 17, 1990, and the first game is scheduled for September 15, 1990.

## II.

On August 9, 1990, Mr. Banks filed this action against the NCAA and Notre Dame. Count I of the complaint, which is brought solely on Mr. Banks' behalf, alleges that NCAA Bylaws 12.2.4 and 12.3 violate § 1 of the Sherman Act, 15 U.S.C. § 1. Pursuant to Count I of the complaint, Mr. Banks seeks to preliminarily enjoin the defendant NCAA from taking any action to enforce, or to encourage any of its members to enforce, NCAA Bylaws 12.2.4 and 12.3 with respect to him. The court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 26. Mr. Banks seeks a preliminary injunction with respect to Count I of his complaint.

### A.

The purpose of a preliminary injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit. It is an interlocutory form of relief which requires the district court to assess the probability that each party will prevail on the merits and the harm of granting or withholding relief during the pendency of the suit.

*Faheem–El v. Klincar*, 841 F.2d 712, 717 (7th Cir.1988) (en banc).

■ A party seeking a preliminary injunction bears the burden of showing: (1) that he will suffer irreparable harm without the preliminary injunction; (2) that the harm he will suffer without injunctive relief is greater than the harm the defendant will suffer as a result of injunctive relief; (3) a reasonable likelihood of success on the merits; and (4) that the injunction will not harm the public interest. *Kinney v. Pioneer Press*, 881 F.2d 485, 490 n. 3 (7th Cir.1989); *Baja Contractors, Inc. v. Chicago*, 830 F.2d 667, 675 (7th Cir.1987), *cert. denied* 485 U.S. 993, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988); *Manbourne, Inc. v. Conrad*, 796 F.2d 884 (7th Cir.1986). An injunction is improper if the movant has an adequate remedy at law, *Scruggs v. Moellering*, 870 F.2d 376, 378 (7th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 371, 107 L.Ed.2d 357 (1989), but the NCAA and Notre Dame concede that Mr. Banks has no such adequate remedy.

■ Mr. Banks must satisfy each of these elements. *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1015 (7th Cir. 1990). A plaintiff need not, depending upon the severity of the harm he will suffer if the injunction does not issue, demonstrate a high probability of success on the merits of his claim; it may suffice that his chances are better than negligible. *Ping v. National Education Ass'n*, 870 F.2d 1369,

1371 (7th Cir.1989); *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903 (7th Cir.1986); *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir. 1984). The more heavily the balance of harm weighs in the plaintiff's favor, the lower the degree of likelihood of success on the merits that is required of the plaintiff. *Thornton v. Barnes*, 890 F.2d 1380, 1384 (7th Cir.1989); *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir.1986); *American Hospital Supply Corp. v. Hospital Products, Ltd.*, 780 F.2d 589, 593 (7th Cir.1986).

■ If the plaintiff makes the necessary showings, the determination of whether injunctive relief should be granted rests within the court's discretion. *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir.1986).[7]

### B.

■ The NCAA argues that Mr. Banks has not shown a likelihood of success on the merits of his antitrust claim. If the court finds no likelihood of success on the merits, the court should deny the preliminary injunction. *Kowalski v. Chicago Tribune Co.*, 854 F.2d 168 (7th Cir.1988); *Illinois Psychological Ass'n v. Falk*, 818 F.2d 1337 (7th Cir.1987).

### 1.

In its memorandum, the NCAA first argues that because the NCAA Bylaws challenged here regulate the non-commercial activities of an organization dedicated to fostering amateurism in college sports, the challenged regulations are not subject to the Sherman Act.

Mr. Banks cites a single case in support of his contention that the NCAA is subject to antitrust laws; the NCAA argues that that case may not support so broad a statement of law. In *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), the United States Supreme Court held that the NCAA's efforts to restrict the televising of college football games was subject to, and violated, the Sherman Act. The Court only found an anticompetitive effect in the NCAA television plan. The Court noted that much of the NCAA's activities have a procompetitive effect:

> What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed on, and all restrain the manner in which institutions compete. Moreover, the NCAA seeks to market a particular brand of football—college football. The identification of this "product" with an academic tradition differentiates college football from and makes it more popular than professional sports to which it might otherwise be comparable, such as, for example, minor league baseball. In order to preserve the character and quality of the "product", athletes must not be paid, must be required to attend class, and the like. And the integrity of the "product" cannot be preserved except by mutual agreement; its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive.

---

7. The NCAA notes that mandatory temporary injunctions compelling defendants to take affirmative action "are ordinarily cautiously viewed and sparingly issued." *Shango v. Jurich*, 681 F.2d 1091, 1097 (7th Cir.1982); *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir.1978). Mr. Banks denies that he seeks a mandatory injunction. Whether the proposed injunction would be mandatory or prohibitory seems to depend upon one's perspective of the case. In any event, the court's decision does not rely on the rule set forth in *Shango v. Jurich*.

468 U.S. at 101–102, 104 S.Ct. at 2960–61. It does not appear, however, that this language was intended to mean that such activities are not subject to the Sherman Act. Instead, it appears that the Court was explaining its decision to apply the Rule of Reason to the television plan rather than finding it to be a *per se* violation of the Sherman Act. For example, the Court explained at a later point in the opinion:

> Our decision not to apply a *per se* rule to this case rests in large part on our recognition that a certain degree of cooperation is necessary if the type of competition that petitioner and its member institutions seek to market is to be preserved. It is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive because they enhance public interest in intercollegiate athletics. The specific restraints on football telecasts that are challenged in this case do not, however, fit into the same mold as do rules defining the conditions of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture.

468 U.S. at 117, 104 S.Ct. at 2969. Finally, the Court concluded:

> The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher eduction adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act. But consistent with the Sherman Act, the role of the NCAA must be to *preserve* a tradition that might otherwise die; rules that restrict output are hardly consistent with this role. Today we hold only that the record supports the District Court's conclusion that

by curtailing output and blunting the ability of member institutions to respond to consumer preference, the NCAA has restricted rather than enhanced the place of intercollegiate athletics in the Nation's life.

468 U.S. at 120, 104 S.Ct. at 2970.

The NCAA cites *Jones v. NCAA,* 392 F.Supp. 295 (D.Mass.1975), in which a Northeastern University hockey player sought restoration of his eligibility for intercollegiate competition after it was discovered that he had been paid for playing hockey during five seasons before his enrollment at Northeastern. The plaintiff claimed the NCAA violated §§ 1 and 2 of the Sherman Act. The court held that the antitrust laws are aimed primarily at combinations with commercial objectives and have limited application to other types of organizations. The student hockey player was not a "competitor" within the contemplation of the antitrust laws and had "not shown how the action of N.C.A.A. in setting eligibility guidelines ha[d] any nexus to commercial or business activities in which the defendant might engage." [8]

The Supreme Court cited *Jones* with apparent approval in *NCAA v. Board of Regents,* 468 U.S. at 102 n. 24, 104 S.Ct. at 2961 n. 24. Nonetheless, after a careful reading of *NCAA v. Board of Regents,* this court is unwilling to rely on a single district court opinion for the conclusion, sought by the NCAA, that the antitrust laws have no application to NCAA regulations concerning eligibility.

## 2.

The NCAA next argues that its "no draft" and "no agent" rules do not violate § 1 of the Sherman Act.

Mr. Banks contends that the Bylaws produce three different and identifiable restraints of trade. First, the NCAA and its members have agreed not to allow Mr. Banks and those like him ever again to play intercollegiate football for a member insti-

---

**8.** Mr. Banks has pointed to a commercial activity in which he wishes to engage: he believes that another season of football at Notre Dame would render him draft-worthy in the eyes of

NFL teams in 1991. Professional football, however, is not an activity in which the NCAA purports to engage.

tution. Second, the Bylaws require all NCAA members to exclude Mr. Banks and those like him from playing football, thus directly restraining Notre Dame and indirectly restraining Mr. Banks. Third, the Bylaws interfere with Mr. Banks' ability (and the ability of those like him) to make himself available for the NFL draft.

■ Section 1 of the Sherman Act makes it unlawful for anyone to contract, combine in the form of trust or otherwise, or conspire, in restraint of trade or commerce among the several states. 15 U.S.C. § 1. Whether a particular arrangement violates the Sherman Act depends upon the arrangement's effect upon competition in the relevant market place. *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 478 (7th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). The parties agree that under *NCAA v. Board of Regents*, the court must apply the Rule of Reason to determine whether the Bylaws at issue offend the Sherman Act.

■ The Rule of Reason requires the court to inquire whether the agreement or action challenged as a restraint is one that promotes competition or one that suppresses competition. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). The plaintiff must show that the restraint has an adverse impact on the competition in the relevant market. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 762, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). The court must determine "whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

■ In any Rule of Reason case, the threshold issue is market power, which is the ability to raise prices above the competitive level by restricting output. *Wilk v. American Medical Ass'n*, 895 F.2d 352, 359 (7th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

■ Definition of the relevant market in a given case often is a challenging intellectual exercise, *see, e.g., United States v. Rockford Memorial Corp.*, 898 F.2d 1278, 1285 (7th Cir.1990) ("It is always possible to take pot shots at a market definition"), and the challenge is no less here. Mr. Banks' brief in support of his motion attempted no such definition. In its responding brief, the NCAA hypothesized a few definitions that might apply. At oral argument, counsel for Mr. Banks stated that the market from which Mr. Banks is excluded consists of all NCAA schools: the challenged Bylaws prevent his participation in intercollegiate football at any NCAA member institution.

In additional proposed findings of facts tendered at the conclusion of the argument, Mr. Banks identified other markets, each peculiar to the three restraints identified above:

> With respect to the first claimed restraint, that imposed by the NCAA and its member institutions, prohibiting Mr. Banks and those like him from playing for any NCAA member, the relevant market is identified as "all those players who wish to play football for major college football teams, a market which is dominated by the NCAA."

> With respect to the second claimed restraint, which operates on NCAA member institutions by requiring them to abide by NCAA rules, Mr. Banks posits a market consisting of "all major college football institutions since all NCAA member institutions are subject to similar restrictions".[9]

---

9. The NCAA contended at oral argument that Mr. Banks would lack standing to raise an antitrust claim with respect to a restraint on Notre Dame. Although the pressures of time did not permit full briefing and consideration of this argument, the NCAA's position on the standing issue appears to be well-taken. *Associated General Contractors of California v. California State*

With respect to the third claimed restraint, which limits to a single occasion a collegiate athlete's opportunity to make himself available for the NFL draft, Mr. Banks identifies a market "composed of players like Banks who are considering entering the NFL draft while they still have college eligibility remaining."[10]

Assuming Mr. Banks' market definition is appropriate[11], the inquiry turns to whether the NCAA exercises market power. Unquestionably, the NCAA exercises authority over its member institutions (the relevant market) by requiring their adherence to the Bylaws. As noted above, however, market power, for antitrust purposes, is the ability to raise prices above the competitive level by restricting output. *See Parts and Electric Motors, Inc. v. Sterling Electric, Inc.,* 866 F.2d 228, 236 (7th Cir. 1988) (Posner, J., dissenting) (market power is "the power to raise the price of its parts above the price that a competitive market would charge, without losing so many sales as to make the price increase unprofitable"). Identifying the concept of "price" in intercollegiate football is no easy matter.

Mr. Banks estimates the value of his grant-in-aid at Notre Dame at $16,000.00 per year; Notre Dame has presented nothing in opposition to that estimate. The record contains no suggestion that Mr. Banks' exclusion from the relevant market will have any impact on the value of a grant-in-aid at Notre Dame. Similarly, the record contains no suggestion that Mr. Banks' participation in, or exclusion from, intercollegiate athletics will have any impact on the value of such scholarships at other member institutions. The value of a grant-in-aid at any NCAA college or university will continue to depend upon the school's tuition, room and board charges, and other related costs, not upon whether unsuccessful aspirants to professional football remain eligible for intercollegiate football.

The record does not indicate that the price the NFL pays for incoming athletes is affected by the restraint. According to documents included within Mr. Banks' evidentiary submission, thirty-eight football players with remaining NCAA eligibility entered the NFL draft, and eighteen were drafted. Of all 335 players drafted by NFL teams in 1989, only sixty percent actually played in a league game during the 1989 season. It does not appear that the flow of players to the NFL has been so restricted as to raise prices. A less direct impact can be hypothesized: a drafted player with an option to return to college football might have heightened bargaining power in contract negotiations with the NFL team that drafted him.

Certainly, the Bylaws impact upon Mr. Banks; the collegiate market for his skills is closed to him. But the Sherman Act "protects competition, not competitors". *Indiana Grocery, Inc. v. Super Valu*

---

*Council of Carpenters,* 459 U.S. 519, 537, 538–545, 103 S.Ct. 897, 908, 908–12, 74 L.Ed.2d 723 (1983); *McCormick v. NCAA,* 845 F.2d 1338, 1342–1343 (5th Cir.1988). In any event, however, Mr. Banks has standing to raise his antitrust claims based on the other two asserted restraints.

**10.** Since Mr. Banks did not propose this market definition until after the hearing, little argument was directed to it. In its brief, the NCAA addressed a variation on this market definition: the market in which amateur football players compete for openings on NFL teams. As so defined, the market would include those collegiate athletes whose eligibility has expired, as well as those with remaining eligibility. The NCAA argued that Mr. Banks was not restrained from competing on this modified market; he competed, and was not drafted, and now seeks an opportunity to return to the college football

market for to make another run at the NFL market.

**11.** Still other markets might be proposed. The relevant market might consist of all institutions that in any sense compensate athletes (whether through salary or grants-in-aid) for playing football. That market would consist of the NCAA and member institutions, the NFL and its twenty-eight teams, and the CFL and its nine teams. Or the market might be defined even more broadly as a segment of the entertainment industry; such a definition of the market would encompass minor league professional baseball, which the Supreme Court suggested might be comparable to college football. *NCAA v. Board of Regents,* 468 U.S. at 101–102, 104 S.Ct. at 2960–61.

In any event, Mr. Banks has not proposed such definitions.

*Stores, Inc.,* 864 F.2d 1409, 1413 (7th Cir. 1989). The record contains little to support the proposition that the "no agent" and "no draft" rules injure competition within the market.

In any event, if "pricing" is translated into the terms of the supply of college football players as defined by eligibility, the NCAA and its member institutions have near-total control of the market of college players; such control might be deemed to provide more than adequate market share to constitute market power. *See generally Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 666 (7th Cir.1987). Even if it is assumed, however, that Mr. Banks has made or could make a showing that the NCAA has market power within the meaning of antitrust analysis (or that he would not be required to do so) [12], the Rule of Reason still would require Mr. Banks to prove that the challenged Bylaws' harmful effects on competition outweigh any beneficial effect on competition.

Mr. Banks argues that the Bylaws at issue constitute unreasonable restraints upon the activities of individuals like him (and institutions such as Notre Dame), since they are overbroad and sweep within their ambit many players who are still amateurs in every meaningful sense of the word, because they have not signed a professional athletic contract and have received nothing of value from any team, agent, or other person, except reimbursement for travel expenses to attend tryouts. He further argues that application of the "no agent" rule (Bylaw 12.3) to him is particularly unreasonable, since he did not retain an agent until after he had entered the 1990 draft.

Analysis under the Rule of Reason does not consider directly whether the challenged restraint is reasonable in the sense of being rationally related to a legitimate purpose. *Quinn v. Kent General Hospital,* 617 F.Supp. 1226, 1244 (D.Del.1985). An inquiry so defined would be appropriate under a constitutional analysis, but *NCAA v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), seems to foreclose a constitutional challenge, and Mr. Banks makes no constitutional claim. The antitrust inquiry is whether the restraint is anticompetitive in light of its surrounding circumstances. *NCAA v. Board of Regents of Oklahoma University,* 468 U.S. at 104, 104 S.Ct. at 2961–62; *Lektro–Vend Corp. v. Vendo Co.,* 660 F.2d 255, 268 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Nonetheless, the rules' relationship to their purpose is not wholly immaterial. Analysis of the effect on competition entails examination of, among other things, circumstances peculiar to the business or industry and the reason for the restraint. *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Where, as here, a defendant claims to have acted with a procompetitive purpose, the challenged restraint must bear some nexus to that purpose for the claim to be credible. *See generally Wilk v. American Medical Ass'n,* 895 F.2d at 361 ("the district court found that the AMA was not motivated by such altruistic concerns").

Mr. Banks has posited a credible anticompetitive effect of Bylaw 12.2.4.2, the "no-draft" rule. College football, he suggests, is a substantial moneymaker. The "no-draft" rule will deter better college football players from testing the waters of professional football for fear of finding themselves in the no-man's land in which Mr. Banks has placed himself. Accordingly, better players will remain in school and out of the NFL draft, enhancing the NCAA's already profitable product.

In turn, the NCAA has articulated procompetitive effects of its "no-draft" rule. NCAA regulations are designed to preserve amateurism and to prevent the professionalization of college sports to the extent educational objectives would be overshadowed. If college football players could shuttle between the professional

---

**12.** Under some circumstances (not necessarily present here), an antitrust plaintiff may prevail even absent a showing of market power. *NCAA v. Board of Regents,* 468 U.S. at 109–110 and n. 42, 104 S.Ct. at 2965 and n. 42.

draft and their college teams, the NCAA argues, the players' profit-making objectives soon would overshadow educational objectives, blur the line between college and professional football, and create a number of potential problems for the effective management of teams engaged in college football.[13]

The NCAA argues that because the By-laws at issue preserve a clear line of demarcation between amateur and professional athletic pursuits, they advance the goal of focusing student-athletes' attention and energies on collegiate endeavors, both academic and athletic, and so have the procompetitive effect of promoting the integrity and quality of college football. The NCAA contends, with some hyperbole, that without the restraints of eligibility rules, the distinct "product", college football, would not survive as an amateur sport.

Courts applying the Rule of Reason have consistently noted the procompetitive effects of NCAA eligibility regulations. The segments of the *NCAA v. Board of Regents* opinion quoted above, although dicta, speak powerfully to the procompetitive nature of NCAA regulations concerning eligibility. Further, the sentiments expressed in that dicta are in harmony with cases decided before and after *NCAA v. Board of Regents.*

In *Justice v. NCAA*, 577 F.Supp. 356 (D.Ariz.1983), varsity football players for the University of Arizona sought to enjoin enforcement of NCAA sanctions that prohibited their school from post-season competition and television appearances. The players claimed the sanctions constituted a group boycott in violation of § 1 of the Sherman Act. Relying in part upon the NCAA's control of television bids, the court held that the Sherman Act applied to the NCAA. The court went on, however, to hold that the sanctions at issue did not violate the Sherman Act:

The sanctions at issue in this case ... have been shown to lack an anticompetitive purpose and to be directly related to the NCAA objectives of preserving amateurism and promoting fair competition.... [T]he NCAA sanction program was designed to prevent intercollegiate athletic programs from being drive by the pressures to "remain competitive" into committing practices that "threaten both the competitive and the amateur nature of the programs ..." [*Hennessey v. NCAA*, 564 F.2d 1136, 1153 (5th Cir. 1977)]. The fact that the sanctions might have an incidental anticompetitive effect on coaches or athletes does not in itself render them unreasonable restraints under the rule of reason.

. . . . .

In sum, it is clear that the NCAA is not engaged in two distinct kinds of rule-making activity. One type ... is rooted in the NCAA's concern for the protection of amateurism; the other type is increasingly accompanied by a discernible economic purpose.... The NCAA sanctions at issue here are clearly of the former variety. Because the sanctions evince no anticompetitive purpose, are reasonably related to the association's central objectives, and are not overbroad, the NCAA's action does not constitute an unreasonable restraint under the Sherman Act. 577 F.Supp. at 382–383.

In *McCormack v. NCAA*, 845 F.2d 1338 (5th Cir.1988), football players for Southern Methodist University sought to enjoin, as violative of § 1 of the Sherman Act, NCAA sanctions against their school; those sanctions entailed a temporary cessation of the football program. After quoting liberally from *NCAA v. Board of Regents*, the court stated its conclusion succinctly: "The NCAA markets college football as a product distinct from professional football. The eligibility rules create the product and allow its survival in the face of commercial-

---

**13.** Newspaper articles submitted with the plaintiff's submission, to which the defendants made no objection, suggest that the NFL would face even more problems. According to those articles, NFL teams worry that if a player could return to college after being drafted, NFL teams would risk wasting their draft choices. It might also be assumed that such an option for drafted players would bring to contract negotiations a new development that NFL teams would find unwelcome.

izing pressures. The goal of the NCAA is to integrate athletics with academics. Its requirements reasonably further this goal." 845 F.2d at 1345. *Accord, United States v. Walters*, 711 F.Supp. 1435, 1441–1442 (N.D.Ill.1989); *College Athletic Placement Service, Inc. v. NCAA*, 1975 Trade Cas. (CCH) ¶ 60,117 (D.N.J.1974).

The court agrees with the holdings of these cases and with the dicta in *NCAA v. Board of Regents* and finds that reasoning equally applicable to the Bylaws at issue here. The NCAA's "no draft" and "no agent" rules are intended to preserve the intercollegiate football's amateur nature. The concept of amateurism is no less central to the concept of amateur college football than are the modest propositions that an athlete must enroll in the college for which he wishes to play, attend classes, and maintain a minimal academic standing. Each of those limitations constitute restraints with some anticompetitive nature: an NCAA member institution will be reluctant to recruit athletes it is not willing to enroll and may not allow participation by athletes to whom it is not willing to award adequate grades. Similarly, limitations upon the number of assistant coaches, *Hennessey v. NCAA*, 564 F.2d 1136, 1154 (5th Cir.1977), have some degree of harm to competition. The procompetitive nature of the regulations, however, outweighs the anticompetitive effects.

It may be, as Mr. Banks argues, that the NCAA's "no draft" and "no agent" rules protect a flawed concept of amateurism. Whether an athlete who has received nothing more than two payments of expenses, or who asked a family friend to attempt to interest NFL teams in his services, would be perceived as a professional by the average citizen is debatable; whether the average citizen would consider a professional baseball player to be an amateur college basketball player may be less debatable. Nonetheless, the Bylaws at issue seek to define amateurism for purposes of intercollegiate athletic eligibility, and the need for such a definition is central to a procompetitive purpose. "That the NCAA has not distilled amateurism to its purest form does not mean its attempts to maintain a mixture containing some amateur elements are unreasonable." *McCormack v. NCAA*, 845 F.2d at 1345.

The NCAA has demonstrated significant procompetitive effects and purpose of the Bylaws at issue. Mr. Banks has not shown a reasonable likelihood of demonstrating a greater anticompetitive effect. He has not demonstrated an ability to show a distortion of pricing, because a substantial number of players seeking positions on NFL rosters fail in their quest; the supply of players is more than adequate. He has demonstrated no ability to show substantial reduction in the supply of amateur players as a result of the NCAA regulations (according to his submission, twenty players with remaining collegiate eligibility made themselves available for the draft but were not drafted). He has demonstrated no harm to consumer welfare apart from the consumers' inability to see him play football this fall, a harm for which he must bear significant responsibility. Accordingly, he has not demonstrated a reasonable likelihood of success on his claim that the NCAA's regulations restrain trade in violation of § 1 of the Sherman Act.

### III.

At a comparatively young age, Braxston Banks was called upon to make a decision that would determine his chosen career. To remain an amateur would have required him to forego a possible lucrative year's salary (and a substantial portion of his career earnings as a professional football player, whose careers last only a few years) and subjected him to the risk of further, perhaps disabling injury in exchange for another year's grant-in-aid. To enter the draft would require him to surrender a grant-in-aid worth $16,000.00 and perhaps defer his postgraduate education, but an NFL running back can probably pay his own way through school. More importantly, a decision to enter the draft would risk the end of his competitive football career.

But while the court sympathizes with Mr. Banks, the NCAA regulations at issue

here, whatever their wisdom or soundness as intercollegiate athletic policy, do not offend the federal antitrust laws. The court cannot rescue Mr. Banks' career hopes by holding otherwise. He has shown no likelihood of success on the merits of his federal antitrust claim, so his motion for preliminary injunction must be, and hereby is, DENIED.

SO ORDERED.