**David R. McCORMACK, et al.,
Plaintiffs-Appellants,**

v.

**NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, Defendant-Appellee.**

No. 87-2802.

United States Court of Appeals,
Fifth Circuit.

June 1, 1988.

David R. McCormack, pro se.

Robert M. Roller, Austin, Tex., George H. Gangware, Kansas City, Mo., for defendant-appellee.

Before RUBIN and POLITZ, Circuit Judges, and DUHE *, District Judge.

ALVIN B. RUBIN, Circuit Judge:

Finding that the football program of Southern Methodist University had exceeded restrictions on compensation for student athletes, the National Collegiate Athletic Association suspended the program for the 1987 season and imposed other penalties. A group of SMU alumni, football players, and cheerleaders challenges that action, contending that the NCAA violated the antitrust and civil rights laws by promulgating and enforcing rules restricting the benefits that may be awarded student athletes. While we give the loyal students and alumni credit for making a college try, we affirm the judgment dismissing their complaint, for we hold that some of the plaintiffs lack standing and the others have failed to state a claim for which relief can be granted to them.

I.

The NCAA found that Southern Methodist University had violated its rules limiting compensation for football players to scholarships with limited financial benefits. It accordingly suspended the SMU football program for the entire 1987 season and imposed restrictions on it for the 1988 season. David R. McCormack, an attorney and SMU alumnus, then filed this class action suit on behalf of SMU "as an institution," its graduates and current students, several members of its football team, and several cheerleaders.

The complaint, as amended, charges antitrust violations in that (1) the restrictions on compensation to football players constitute illegal price-fixing in violation of the Sherman Act and (2) the suspension of SMU constitutes a group boycott by other NCAA members. The suspension, the complaint alleges, has destroyed the football players' careers and caused the cheerleaders "considerable emotional anguish and distress" by depriving them of the opportunity to conduct their cheerleading activities at games.

In addition, all of the plaintiffs assert that the NCAA has repeatedly imposed penalties on the college football program of SMU in unequal fashion and without due process of law, thereby damaging "the image of the University as an academic institution," endangering "[its] existence ... as an academic institution," and causing it to lose revenues from donors. The NCAA's actions, it is alleged, have deprived McCormack and others of "their right to associate together in support of the University by attendance at the football games of the University," while the football players have been "forced to discontinue their athlete-academic duties" at SMU and the cheerleaders have lost the opportunity to lead cheers at football games.

The plaintiffs seek (1) injunctive relief; (2) for the injuries suffered by the football players, treble money damages; (3) for the price-fixing violations, $20 million "in the name of the University and all graduates and students thereof," to be trebled after judgment; (4) for the group boycott, $50 million trebled to $150 million; and (5) for the civil rights violations, an additional $20 million payable to SMU.

McCormack's first complaint named only himself as representative of the class of alumni and students, and it asserted only the group boycott and civil rights claims. The NCAA moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief could be granted. McCormack then amended his complaint to add the football players and cheerleaders as plaintiffs and the price-fixing allegations as a theory of relief, without, however, altering his allegations in any other material way. The district court, without opinion, dismissed the complaint for failure to state a claim for which relief could be granted.

II.

Many of the claims the plaintiffs assert are SMU's, so we first determine whether they can represent the University's interests. The Constitution limits the jurisdic-

* District Judge of the Western District of Louisiana, sitting by designation.

tion of federal courts to cases and controversies.[1] Even when a plaintiff meets constitutional requirements for standing to sue, he may still lack standing under prudential principles, one of which limits "access to the federal courts to those litigants best suited to assert a particular claim." [2] A plaintiff generally must assert his own legal rights and interests, not those of third parties.[3]

SMU is a legal entity, but it has not appeared in this action, and the plaintiffs do not contend that they are authorized to represent it. They attempt to analogize themselves to shareholders bringing a derivative suit, but, unlike shareholders, they own no interest in SMU. Moreover, they have not followed the federal and state rules governing derivative suits.[4] Each of these provisions requires the derivative plaintiff to allege "with particularity" his efforts to convince the corporation to sue or his reasons for not making such efforts, neither of which the plaintiffs have alleged.

The general rule against third-party standing will often not bar a claim if the plaintiff himself has suffered a cognizable injury and the third party for some reason cannot assert its own rights.[5] We find no indication, however, that SMU is disabled from pressing its rights. The plaintiffs, therefore, may not assert the claims of the University in a § 1983 or an antitrust action. For these reasons, all claims asserted on behalf of SMU were properly dismissed.

### III.

Not every person who complains of injury as a result of violation of the antitrust laws has standing to assert claims under the statutes. Only a person injured "in his business or property" may seek damages for violation of the antitrust laws,[6] and only a person who can show a significant threat of such injury from impending violations can obtain injunctive relief.[7] Even a plaintiff injured in his business or property must, in order to sue for damages, show "antitrust injury," that is, "injury of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." [8] Finally, even if the plaintiff meets these requirements, the court must consider whether he is a "proper plaintiff" to sue for damages, examining such factors as (1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment.[9]

Neither McCormack nor any of the cheerleaders satisfies these requirements. The cheerleaders assert only the loss of the opportunity to lead cheers,

1. Article III, § 2.

2. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979).

3. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (*citing Tilestone v. Ullman*, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943)); *see Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67, 92 S.Ct. 1965, 1968, 32 L.Ed.2d 627 (1972).

4. Fed.R.Civ.P. 23.1; Texas Business Corporation Act art. 5.14, 3A Vernon's Ann.Tex.Stat. art. 5.14 (1980). *See, e.g., Surowitz v. Hilton Hotels Corporation*, 383 U.S. 363, 371, 86 S.Ct. 845, 850, 15 L.Ed.2d 807 (1966).

5. *See Barrows v. Jackson*, 346 U.S. 249, 256–57, 73 S.Ct. 1031, 1034–35, 97 L.Ed. 1586 (1953);

*Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984); *Singleton v. Wulff*, 428 U.S. 106, 115–16, 96 S.Ct. 2868, 2875, 49 L.Ed.2d 826 (1976) (plurality opinion of Blackmun, J.); *see generally* Henry P. Monaghan, Third Party Standing, 84 Colum.L.Rev. 277 (1984).

6. Clayton Act § 4, 15 U.S.C. § 15 (1982).

7. Clayton Act § 16, 15 U.S.C. § 26; *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, ——, 107 S.Ct. 484, 490–91, 93 L.Ed.2d 427 (1986).

8. *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 93 L.Ed.2d 701 (1977) (*quoted in Cargill*, 107 S.Ct. at 489).

9. *Associated General Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545, 103 S.Ct. 897, 912, 74 L.Ed.2d 723 (1983);

which clearly does not qualify as an injury to business or property. The only injuries McCormack alleges are the devaluation of his degree, the loss of the opportunity to see football games, and the damage to his contact and association with current and prospective student athletes derived from his membership in the Mustang Club, "an athletic fund-raising organization." Of these three, only the first is even arguably an injury to business or property. Although the Supreme Court has emphasized that "property" in this context "has a naturally broad and inclusive meaning," [10] we cannot conclude that the devaluation of McCormack's degree is an injury for which the antitrust laws were designed to afford a remedy. The alleged connection, moreover, between the NCAA's actions and the devaluation of his degree presents the sort of "speculative" and "abstract" causal chain that the Supreme Court has held insufficient to support antitrust standing.[11]

The claims of the football-player plaintiffs rest on a different basis. They contend that they have suffered an injury to their business, playing football: that they in effect sell their labor to SMU and that the NCAA rules restrict the amount that SMU or any other competing university can pay them, thus eliminating their opportunity to offer those services to the highest bidder. As we held in *Tugboat, Inc. v. Mobile Towing Co.,* [12] the selling of one's labor is a commercial interest.

Even so, employees generally are not "proper plaintiffs" to sue for injuries their employer suffers as the target of antitrust violations, because injuries to the employees are indirect.[13] Yet, the District of Co-lumbia Circuit has noted, "[e]mployees in professional sports have surmounted the standing inquiry simply because their injuries have stemmed at least in part from restraints in *the labor market itself.*" [14] We drew a similar distinction in *Tugboat,* holding that employees could not sue based solely on the damage they suffered as a result of their employers' economic injuries, but only if the alleged violations aimed at the employees themselves.[15] The eligibility rules aim at the football players, for their very purpose is to restrict student athletes' compensation.

The Supreme Court taught, however, in *Associated General Contractors of Cal. v. Cal. State Council of Carpenters* [16] that a plaintiff does not have standing to sue for damages simply because he is injured by an antitrust conspiracy aimed at him. The Court there relied on other factors—the remoteness of injury, the existence of parties more directly harmed, and the risk of duplicative or complicated suits—in concluding that construction unions were not "proper plaintiffs" to sue a group of contractors who, the unions alleged, had coerced landowners and other contractors to hire non-union subcontractors and thereby injured the unions.[17]

The alleged violations in *Associated General Contractors* did not affect the unions directly, and the Supreme Court concluded that the connection between the violations and any injuries to the unions was too speculative and would render damage calculations too difficult.[18] Here the relationship between the alleged violations and the players' injuries is far more direct. SMU, however, remains the party most directly

---

Campbell v. Wells–Fargo Bank, N.A., 781 F.2d 440, 443 (5th Cir.1986).

10. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 338–39, 99 S.Ct. 2326, 2330–31, 60 L.Ed.2d 931 (1979).

11. *Associated General Contractors,* 459 U.S. at 543, 103 S.Ct. at 911; *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 475 n. 11, 102 S.Ct. 2540, 2547 n. 11, 73 L.Ed.2d 149 (1982).

12. 534 F.2d 1172, 1176 (5th Cir.1976).

13. *Tugboat,* 534 F.2d at 1176.

14. *Adams v. Pan American World Airways, Inc.,* 828 F.2d 24, 28 (D.C.Cir.1987) (*citing Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1175 n. 2 (D.C.Cir. 1978)).

15. *Tugboat,* 534 F.2d at 1176, 1177.

16. 459 U.S. 519, 537, 103 S.Ct. 897, 908, 74 L.Ed.2d 723 (1983).

17. *Id.* at 538–45, 103 S.Ct. at 908–12.

18. *Id.* at 542, 545, 103 S.Ct. at 911, 912.

harmed by the NCAA's action, and because some of the football players have been able to transfer to other schools, we foresee some difficulty in calculating the damages they have suffered. Had the players alleged that they had been completely disqualified from playing college football, or that they had declined or at least would have received more lucrative scholarship offers from other schools because of the eligibility restrictions, they would present a more compelling claim to be "proper plaintiffs" under *Associated General Contractors.*

■ We have decided, however, not to resolve the issue whether the football players are proper plaintiffs, but to assume for present purposes that they do have standing. The issue is close, and we lack the benefit of full briefing of it by the parties. Whether a plaintiff has antitrust standing does not raise a question of jurisdiction on which we are required without exception to satisfy ourselves. Finally, the factors that militate against allowing the football players to sue for damages do not necessarily undercut their request for an injunction.[19] We therefore address the antitrust claims on their merits.

### IV.

In reviewing the district court's dismissal of the action for failure to state a claim, we will not affirm "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [20] We take the allegations of the complaint to be true, but we do not assume facts that the plaintiffs have not alleged.[21] Applying these standards, we are convinced that the football-player plaintiffs have failed even to carry the minimal burden required to survive a motion to dismiss.

The Supreme Court has recently considered the antitrust laws in relation to college football. In *NCAA v. Board of Regents of the University of Oklahoma,*[22] the Court held that the antitrust laws apply to some aspects of college football competition and that the NCAA had violated those laws by placing restrictions on the ability of member schools to sell the rights to televise the schools' football games.

■ The NCAA argues that, despite the holding in *Board of Regents,* its eligibility rules are not subject to the antitrust laws because, unlike the television restrictions in *Board of Regents,* the eligibility rules have purely or primarily noncommercial objectives. The NCAA's argument finds some support in the caselaw,[23] but we need not address it here. Assuming, without deciding, that the antitrust laws apply to the eligibility rules, it does not follow that the rules violate those laws. The Sherman Act does not forbid every combination or conspiracy in restraint of trade, only those that are unreasonable.[24] We hold that the NCAA's eligibility rules are reasonable and that the plaintiffs have failed to allege any facts to the contrary.

■ The plaintiffs argue that the eligibility rules constitute price fixing by a cartel of buyers of labor and so should be conclusively presumed to be unreasonable and therefore illegal.[25] In *Board of Regents,* however, the Supreme Court held that the NCAA's rules prescribing the way in which its members compete with one

---

**19.** *Cargill,* 107 S.Ct. at 490 n. 6.

**20.** *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

**21.** *Associated General Contractors,* 459 U.S. at 526, 103 S.Ct. at 902.

**22.** 468 U.S. 85, 117, 120, 104 S.Ct. 2948, 2969, 2970, 82 L.Ed.2d 70 (1984).

**23.** *See, e.g., Justice v. NCAA,* 577 F.Supp. 356, 383 (D.Ariz.1983); *Jones v. NCAA,* 392 F.Supp. 295, 303 (D.Mass.1975).

**24.** *See, e.g., Board of Regents,* 468 U.S. at 98, 104 S.Ct. at 2959; *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918).

**25.** *See, e.g., Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 235, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948); *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 221–22, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940).

another should be analyzed under the rubric of reasonableness, rather than condemned as per se illegal.[26] The Court recognized that in college football,

> horizontal restraints on competition are essential if the product is to be available at all.... What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed.[27]

Similarly, this court has recognized that "in some sporting enterprises a few rules are essential to survival."[28] We have held that if indicia of anticompetitive intent are lacking, the rule-of-reason analysis applies.[29]

The essential inquiry under the rule-of-reason analysis is whether the challenged restraint enhances competition.[30] Applying this test, we have little difficulty in concluding that the challenged restrictions are reasonable. The Supreme Court indicated strongly in *Board of Regents* that such was the case. In a paragraph mentioning the eligibility rules expressly, the majority stated:

> It is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive because they enhance public interest in intercollegiate athletics.[31]

The Court further explained:

> [T]he NCAA seeks to market a particular brand of football—college football. The identification of this "product" with an academic tradition differentiates college football from and makes it more popular than professional sports to which it might otherwise be comparable, such as, for example, minor league baseball. *In order to preserve the character and quality of the "product," athletes must not be paid, must be required to attend class, and the like.* And the integrity of the "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive.[32]

The two dissenters struck a similar note. Mentioning many NCAA rules, including those limiting the compensation of student athletes, they observed:

> One clear effect of most, if not all, of these regulations is to prevent institutions with competitively and economically successful programs from taking advantage of their success by expanding their programs, improving the quality of the product they offer, and increasing their sports revenues. Yet each of these regulations represents a desirable and legitimate attempt "to keep university athletics from becoming professionalized to the extent that profit making objectives would overshadow educational objectives."[33]

The NCAA markets college football as a product distinct from professional football.

---

**26.** 468 U.S. at 100–04, 104 S.Ct. at 2959–61.

**27.** *Id.* at 101, 104 S.Ct. at 2960; *see also Broadcast Music, Inc. v. Columbia Broadcasting System,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).

**28.** *Hatley v. American Quarter Horse Ass'n,* 552 F.2d 646, 652 (5th Cir.1977).

**29.** *See id.* at 653; *see also Hennessey v. NCAA,* 564 F.2d 1136, 1152–53 (1977).

**30.** *See Board of Regents,* 468 U.S. at 104, 104 S.Ct. at 2961.

**31.** *Id.* at 117, 104 S.Ct. at 2969.

**32.** *Id.* at 102, 104 S.Ct. at 2960–61 (emphasis added, footnote omitted).

**33.** *Id.* at 123, 104 S.Ct. at 2972 (White, J.) (citation omitted).

The eligibility rules create the product and allow its survival in the face of commercializing pressures.[34] The goal of the NCAA is to integrate athletics with academics. Its requirements reasonably further this goal.

After amending their complaint once and withdrawing another amendment, the plaintiffs still produce only two allegations to support their claim that the NCAA's rules are designed to stifle competition: that the NCAA permits some compensation through scholarships and allows a student to be a professional in one sport and an amateur in another. Accepting these facts as true, however, they do not undermine the rationality of the eligibility requirements. That the NCAA has not distilled amateurism to its purest form does not mean its attempts to maintain a mixture containing some amateur elements are unreasonable. We therefore conclude that the plaintiffs cannot prove any set of facts that would carry their antitrust claim and that the motion to dismiss was properly granted.

Because the eligibility rules do not violate the antitrust laws, enforcement of them through suspension and other restrictions does not constitute an illegal group boycott.[35]

## V.

The district court also properly dismissed the plaintiffs' civil rights claims. The Civil Rights Act of 1871 [36] creates a cause of action for damages against any person who "under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives another of any right secured by the Constitution or laws of the United States. The Supreme Court has explained: "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." [37] The same question is posed in both instances: "is the alleged infringement of federal rights 'fairly attributable to the State'?" [38]

In *Parish v. National Collegiate Athletic Association*,[39] we held that NCAA actions were taken under color of state law, relying on two rationales: (1) state colleges and universities "play a substantial, although admittedly not pervasive, role in the NCAA's program"; [40] and (2) in coordinating and overseeing intercollegiate athletics, the NCAA performs "a traditional governmental function." [41] Although the members of this panel might agree with those views, later Supreme Court decisions have more narrowly defined the concept of state action, and since these decisions virtually every court to consider the issue has concluded that the NCAA's actions are not those of the state or taken "under color" of state law.[42]

34. *See id.* at 102, 104 S.Ct. at 2960–61; Note, Tackling Intercollegiate Athletics: An Antitrust Analysis, 87 Yale L.J. 655, 676 (1978); Note, Antitrust and Nonprofit Entities, 94 Harv.L.Rev. 802, 817–18 (1981).

35. *See* Note, 87 Yale L.J. at 678–79.

36. 42 U.S.C. § 1983 (1982).

37. *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966), *quoted in Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982).

38. *Rendell–Baker*, 457 U.S. at 838, 102 S.Ct. at 2770 (*quoting Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982)).

39. 506 F.2d 1028 (5th Cir.1975). *See also Howard University v. NCAA*, 510 F.2d 213, 219–20

(D.C.Cir.1975); *Rivas Tenorio v. Liga Atletica Interuniversitaria*, 554 F.2d 492, 495 (1st Cir. 1977); *Regents of the University of Minnesota v. NCAA*, 560 F.2d 352, 364–65 (8th Cir.), *cert. dismissed*, 434 U.S. 978, 98 S.Ct. 600, 54 L.Ed.2d 472 (1977); *Associated Students, Inc. v. National Collegiate Athletic Association*, 493 F.2d 1251, 1254–55 (9th Cir.1977).

40. *Parish*, 506 F.2d at 1032 (*citing Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)).

41. *Id.* at 1033 (*citing Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946)).

42. *Graham v. NCAA*, 804 F.2d 953, 957–58 (6th Cir.1986); *Arlosoroff v. NCAA*, 746 F.2d 1019, 1021–22 (4th Cir.1984); *Hawkins v. NCAA*, 652 F.Supp. 602, 606–09 (C.D.Ill.1987); *Kneeland v. NCAA*, 650 F.Supp. 1047, 1054–55 (W.D.Tex.

In *Rendell–Baker v. Kohn* [43] and *Blum v. Yaretzky,* [44] the Supreme Court held that the state's participation in a private party's activities does not make the party a state actor unless the state has coerced or encouraged the party's decision to the extent that it was essentially the state's choice. The fact that many of the NCAA's members are state-funded schools does not meet this test. [45] The plaintiffs assert that "no court has held that state action cannot be found on the part of the NCAA as a matter of law" and that they believe that after discovery, "they can establish state action by showing that large state institutions dominate the decision-making processes of the NCAA." They must show, however, "that the State is *responsible* for the *specific conduct* of which [they] complain." [46] The plaintiffs have not alleged any facts tending to show that state institutions as a group caused the eligibility rules to be enacted or to be enforced against SMU. [47] Even taking the plaintiffs' allegations as true, therefore, the district court properly dismissed their complaint.

As the Sixth Circuit noted in *Graham v. National Collegiate Athletic Association:* [48] "The earlier cases were premised on the theory that indirect involvement by state governments could make conduct normally considered to be private action into state action. The Supreme Court rejected that theory, however, in *Rendell–Baker* and *Blum.*"

Nor could the plaintiffs prove, even had they alleged, that the NCAA's actions are attributable to the state because the NCAA fulfills a governmental function. The function must be "traditionally the *exclusive* prerogative of the state." [49] Although coordination and oversight of intercollegiate athletics may serve a public purpose, it is hardly a function traditionally reserved exclusively to the state. [50]

The Supreme Court has agreed to review a state supreme court decision holding the NCAA to be a state actor. [51] The state court in that case, however, relied heavily on the fact that the employee against whom the NCAA acted worked at a public university, reasoning that "the right to discipline public employees is traditionally the exclusive prerogative of the state" and that the state university had participated sufficiently in the NCAA's decisions by imposing the sanctions against its employee. [52] Because SMU is a private university, this rationale, whatever its merit, is inapplicable here. We therefore conclude that *Parish* is no longer good law and join the virtually unanimous roster of courts that have held, since the decisions in *Rendell–Baker* and *Blum,* that the NCAA is not the state or a state agency and hence does not act under color of law within the meaning of § 1983.

---

1986); *McHale v. Cornell University,* 620 F.Supp. 67, 69–70 (N.D.N.Y.1985); *but see Tarkanian v. NCAA,* 741 P.2d 1345, 1347–49 (Nev.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1011, 98 L.Ed.2d 977 (1988). *See also Ponce v. Basketball Feder. of Com. of Puerto Rico,* 760 F.2d 375, 377–82 (1st Cir.1985).

**43.** 457 U.S. 830, 840, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982).

**44.** 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982).

**45.** *But see* Note, Balancing Due Process and Academic Integrity in Intercollegiate Athletics, 62 Ind.L.J. 1151, 1156–58 (1987).

**46.** *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2786 (first emphasis in original, second emphasis added).

**47.** *Compare Graham,* 804 F.2d at 958; *Arlosoroff,* 746 F.2d at 1021.

**48.** 804 F.2d 953, 958 (6th Cir.1986).

**49.** *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2772 (emphasis in original) (*quoting Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974)); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 157–58, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978).

**50.** *Graham,* 804 F.2d at 958; *Arlosoroff,* 746 F.2d at 1021; *see also Kneeland,* 650 F.Supp. at 1055; *McHale,* 620 F.Supp. at 70.

**51.** *Tarkanian v. NCAA,* 741 P.2d 1345 (Nev. 1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1011, 98 L.Ed.2d 977 (1988).

**52.** *Id.* at 1348–49.

For these reasons, we AFFIRM the judgment of the district court.