PATRICK E. HIGGINBOTHAM, Circuit Judge,
dissenting:
I agree that this is not an easy case, but I have no hesitation in concluding that the Foreign Trade and Antitrust Improvements Act does not here divest the federal courts of jurisdiction and that the plaintiff has standing. With deference to my colleagues, I am persuaded by the plain text of section 6a, as well as its statutory context, legislative history, and purpose.
The claim is that defendants allocated the market for hundreds of millions of dollars of commerce — an allocation that placed United States markets at the mercy of monopoly charges in an industry vital to national security. The charged conspiracy was no foreign cabal whose secondary effects only lapped at United States shores. The impact of the. conspiracy was direct and substantial. Indeed, the participation of American business in the market allocation scheme was critical to its success. The plaintiff here is a foreign company, true enough, but it was injured by the same acts of defendants that injured American plaintiffs whose right to seek recovery of their losses the district court recognized in this litigation.
With the Foreign Trade and Antitrust Improvements Act, Congress set out to insulate United States business from its antitrust laws for certain business conducted outside the country. Its central purpose was to assist American business in competing abroad. This pass from antitrust restrictions did not extend to all conduct outside the United States. It stopped short of insulating conduct having direct and substantial effects upon American commerce and causing antitrust injury to that commerce sufficient to support a claim for treble damages.
I am not persuaded that when illegal conduct produces these domestic effects, that Congress intended to close the door to a foreign company injured by the same illegal conduct. That was not the law before this effort to assist American business abroad, and Congress did not intend to change it or do so unwittingly. I would reverse and remand for further proceedings.
I
A
Interpretation of a statute must begin with the text of the statute itself. Section 6a states in its entirety:
Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import *432 trade or import commerce) with foreign nations unless—
(1) such conduct has á direct, substantial, and reasonably foreseeable effect—
(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.
[Proviso:] If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.[1]
Section 6a(l) requires an effect on (A) domestic or import commerce of the United States or (B) the export commerce of a person in the United States.[2] Section 6a(2) requires that this effect “give[ ] rise to a claim under the provisions of sections 1 to 7 of this title, the Sherman Act, other than this section.” The majority reads section 6a(2) to require that the effect “give[ ] rise to” the plaintiff’s claim. It does not say that. It does say that the effect must “give[ ] rise to a claim.”[3] In other words, the effect on United States commerce must be sufficient to support a claim, an injury of some person in a way cognizable under the Sherman Act.[4]
The literal text of the statute supports this conclusion. It reads, “gives rise to a claim.” The word “a” has a simple and universally understood meaning. It is the indefinite article. There are many terms of art about which one can debate whether Congress uses the term as courts do, but this word is not one of them. If the drafters of the FTAIA had wished to say “the claim” instead of “a claim,” they certainly would have.[5]
The reference to “a” claim makes clear that the “effect” described by section 6a(l) must violate the Sherman Act — that is, harm competition. Section 6a(l) requires that the conspiracy have an effect on United States commerce; section 6a(2) requires that this effect either monopolize commerce or restrain trade in the United States, thereby giving rise to a Sherman Act claim. Section 6a(2) removes jurisdiction over conspiracies whose effects on United States commerce are beneficial or benign, even if they restrain competition in other parts of the world. That an injury that “gives rise to” an antitrust claim must be an injury caused by harm to competi *433 tion is no light notion. It is a well established and fundamental tenet of antitrust law.[6] Termed “antitrust injury,” it is frequently encountered in enforcement action under the Clayton Act, by which Congress enlisted private enforcement in supplementation of governmental enforcement of the Sherman Act.[7]
Thus, the literal text does not require that the effect on United States commerce give rise to the plaintiffs claim. At worst, the text is sufficiently ambiguous to allow for both the construction the majority offers and the construction I believe is correct. At the least, the majority cannot find support in a plain text argument.
Accepting that the text of the FTAIA' compels neither the majority’s reading or mine, we must enlist other aids in determining the meaning of the statute. In doing so, I conclude that the textual conclusion that “a” means “a” is supported by the statutory context of the FTAIA, which describes the function of the FTAIA and its animating purpose, and by the purposes of the antitrust laws in general; by the legislative history of the FTAIA; and by the sparse ease law that interprets the FTAIA.
B
The FTAIA was enacted as Title IV of Public Law 97-290, entitled “Export Trading Company Act of 1982.”[8] Title I contains the congressional findings. Every single congressional finding relates to the importance of export business and the need to encourage export activity by American business.[9] The statute then states: “It is the purpose of this Act to increase United States exports of products and services by encouraging more efficient provision of export trade services to United States producers and suppliers, in particular by ... modifying the application of the antitrust laws to certain export trade.”[10] It could not be clearer that the FTAIA serves to exempt exporting from antitrust scrutiny, not to limit the liability of participants in transnational conspiracies that affect United States commerce.[11]
*434 The text of the FTAIA implements this purpose perfectly. The Sherman Act, pri- or to the enactment of the FTAIA, applied to conduct that affected domestic, import, and export commerce. Recall that section 6a(l) limiting the reach of the Sherman Act applies to conduct that affects (1) domestic commerce; (2) import commerce; or (3) export commerce, but only to the extent that American exporters are affected. One class of conduct is excluded: conduct that affects only foreign purchasers of American exports. This is the function of the FTAIA: to protect American exporters who monopolize or conspire to restrain export trade that does not harm United States commerce.
The purpose of the FTAIA offers no support for the majority’s reading of the statute. It is undisputed that if proved, the conspiracy in this case would have direct, substantial, and reasonably foreseeable effects upon United States commerce. No American exporters are implicated by this suit. American exporting business can only be harmed by the alleged conspiracy in this case.
Indeed, interpreting the FTAIA as the majority wishes will impair the competitiveness of American exporters. Under the majority’s view, an American cartel that fixes prices worldwide will be subject to Clayton Act suits by plaintiffs from around the world,[12] but a foreign cartel that fixes prices worldwide will be subject to suit under the Clayton Act only from plaintiffs injured in American commerce. This interpretation of the FTAIA transforms a safe harbor for American exporters into a boon for foreign cartels that restrain commerce in the United States.
With respect to my colleagues, I fear that their reading of the FTAIA will hinder its purposes and reduce the effectiveness of the antitrust laws. Nothing in the text of the FTAIA, or the Export Trading Company Act of 1982 as a whole, or its legislative history, casts doubt on the importance of deterring restraints of trade that affect United States commerce. The Supreme Court has repeatedly recognized that the accent of the Sherman and the Clayton Acts is deterrence, requiring violators to pay full, treble damages, even if some plaintiffs gain a windfall or are foreigners. For example, in Illinois Brick Co. v. Illinois,[13] the Supreme Court noted the importance of “vigorous private enforcement of the antitrust laws” and “deterring violators” and recognized that “from the deterrence standpoint, it is irrelevant to whom damages are paid, so long as some one redresses the violation.”[14]
The Supreme Court in Pfizer, Inc. v. Government of India[15] addressed a situation somewhat analogous to this case. The government of India sued several Ameri *435 can pharmaceutical manufacturers under the Clayton Act for damages caused by a price-fixing conspiracy. Like Statoil, the government of India alleged a worldwide conspiracy that raised prices in the United States and abroad. Unlike in this case, in Pfizer the sales were made in the United States.[16] In holding that foreign governments could recover under the Clayton Act, Justice Stewart observed: “Treble-damage suits by foreigners who have been victimized by antitrust violations clearly may contribute to the protection of American consumers.... [A]n exclusion of all foreign plaintiffs would lessen the deterrent effect of treble damages.”[17]
The logic underlying this conclusion is straightforward. Conspirators facing antitrust liability only to plaintiffs injured by their conspiracy’s effects on the United States may not be deterred from restraining trade in the United States. A worldwide price-fixing scheme could sustain monopoly prices in the United States even in the face of such liability if it could cross-subsidize its American operations with profits from abroad. Unless persons injured by the conspiracy’s effects on foreign commerce could also bring antitrust suits against the conspiracy, the conspiracy could remain profitable and undeterred.
It is no rejoinder that conspirators would simply choose to exclude the United States from any price-fixing conspiracy as long as American plaintiffs could sue. In at least some cases, including the United States in a price-fixing conspiracy is necessary to generate monopoly profits. Otherwise, arbitrage would rapidly equalize unequal prices around the globe as speculators resold goods purchased in the United States to buyers in high-price regions.[18] Thus, a cartel may find it impossible to fix prices anywhere without a worldwide conspiracy. The Sherman Act can only deter these violations if it protects all parties injured by such a conspiracy.
Justice Stewart succinctly made this argument in Pfizer:
The conspiracy ... operated domestically as well as internationally. If foreign plaintiffs were not permitted to seek a remedy for their antitrust injuries, persons doing business both in this country and abroad might be tempted to enter into anticompetitive conspiracies affecting American consumers in the expectation that the illegal profits they could safely extort abroad would offset any liability to plaintiffs at home. If, on the other hand, potential antitrust violators must take into account the full costs of their conduct, American consumers are benefited by the maximum deterrent effect of treble damages upon all potential violators.[19]
C
The legislative history also supports this reading of the statute and undermines the majority’s interpretation of section 6a(2). *436 The Committee Report on the House bill that became the FTAIA states that the FTAIA
does not exclude all persons injured abroad from recovering under the antitrust laws of the United States. A course of conduct in the United States— e.g., price fixing not limited to the export market — would affect all purchasers of the target domestic products or services, whether the purchaser is foreign or domestic. The conduct has the requisite effects in the United States, even if some purchasers take title abroad or suffer economic injury abroad.[20]
This statement explicitly refers to plaintiffs who “suffer economic injury abroad.” The majority’s interpretation of the statute is contrary to this statement in the legislative history. The “effect” on United States commerce is the injury suffered by purchasers in the United States; this effect does not give rise to the injury suffered by the foreign plaintiffs. Yet the legislative history contemplates such plaintiffs recovering under the Sherman Act. The scenario described in this statement is virtually identical to the instant case: a conspiracy sells to buyers in the United States and abroad, and each of the buyers is injured. All are injured by the same conspiracy, and it is a conspiracy that has been injurious to competition in the United States.
The majority, however, chooses to rely on the. following statement in the same House Report:
A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws.... It is thus clear that wholly foreign transactions as well as export transactions are covered by the [FTAIA], but that import transactions are not.[21]
That American ownership alone should not create jurisdiction over a wholly foreign conspiracy is not controverted, controversial, or relevant to this case. What is relevant is that the language omitted from the quotation above states that if a conspiracy between two foreign firms, regardless of American ownership, does have an effect on domestic commerce, there is jurisdiction.[22]
D
I recognize that there is little precedent to guide our analysis of this question. Of the case law that does exist, there are no appellate court cases supporting the majority’s holding. To the contrary, the majority must reconcile or distinguish the only other circuit court decisions interpreting the FTAIA, because all of them find jurisdiction present.
The majority opinion struggles, and I believe fails, to reconcile Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC,[23] which involved a foreign plaintiff alleging monopolization in radio advertising in the Caribbean by a competing radio station. The defendant was also a foreign entity. Consistent with the reasoning of this dissent, the D.C. Circuit held that the FTAIA did not preclude jurisdiction, because the plaintiff showed that the foreign defendants’ conduct had the effect of harming United States purchasers of advertising. It stated: “the alleged injury is to advertisers in the United States.”[24] *437 Thus, based on the injury to advertisers in the United States, the court found jurisdiction over a suit by a radio broadcaster in the Caribbean. The D.C. Circuit did not require that the injury to American advertisers “give[ ] rise to” the plaintiffs cause of action; its determination that the injury gave rise to “a” claim was sufficient.
E
Finally, the majority’s attempt to enlist the aid of the Commerce Clause and the canon of construction that creates a presumption against extraterritoriality is mistaken.
The majority suggests that the interpretation of the FTAIA that I espouse is beyond the power of Congress to regulate commerce.[25] The Supreme Court itself has recognized — in the context of the Sherman Act — that Congress has intended to regulate, and constitutionally has regulated, foreign conduct that affects United States commerce.[26] And it has been decades since any court has taken so cramped a view of the Commerce Clause in any context.[27]
The majority is correct to note that the courts’ historical willingness to apply the Sherman Act extraterritorially is not dis-positive of this appeal, since the FTAIA, and not the courts’ earlier interpretations of the Sherman Act, is controlling here.[28] But precisely because the FTAIA applies here, the majority’s reliance on the canon against extraterritorial application of statutes is misplaced. This canon operates when Congress has not clearly spoken on the issue of extraterritoriality.[29] The FTAIA, however, explicitly addresses nothing other than extraterritoriality. We must be careful not to use such a canon when Congress is speaking directly to the relevant issue. Make no mistake: such canons reflect substantive presumptions about the content of laws. If courts apply substantive canons of construction against statutes that do speak to an issue, then it is the courts, not Congress, who are making the policy choices that form the content of legislation.[30]
II
Because I disagree with the majority’s interpretation of the FTAIA, I would reach the standing inquiry. It is straightforward; this court has restated the test for standing under the Clayton Act as “1) injury-in-faet, an injury to the plaintiff proximately caused by the defendants’ con *438 duct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit.”[31]
Statoil has standing. First, it has suffered injury-in-fact. It paid inflated prices directly to the defendants.
Second, Statoil has suffered antitrust injury. Antitrust injury requires that the injury to the plaintiff not merely show “injury causally linked to an illegal presence in the market” but injury “attributable to an anti-competitive aspect of the practice under scrutiny.”[32] This element of standing excludes plaintiffs, primarily competitors, harmed by increased, rather than decreased, competition.[33] Statoil’s injury was the direct result of the alleged price-fixing conspiracy and consequent restraint of trade.[34]
Third and finally, Statoil is a proper plaintiff. In determining whether a party is a proper plaintiff, it should examine “such factors as (1) whether the plaintiffs injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplica-tive recoveries, or complex damage apportionment.” [35]
First, neither Statoil’s injuries, nor their connection to the defendants, is speculative. The injuries arise from the defendants charging Statoil monopoly prices. Second, other parties have not been harmed more directly than Statoil. Statoil was a purchaser in the market for heavy-lift barge services, the market in which the defendants fixed prices. Third, allowing Statoil to sue would not risk duplicative recoveries or the like. There is no suggestion that any unnamed party can seek to recover for the same damages Statoil suffered.
Ill
The antitrust laws have always given federal courts jurisdiction over conspiracies that adversely affect competition in the United States. The FTAIA limits that jurisdiction; but it does so by exempting American export conspiracies, not foreign conspiracies that injure American competition.
The majority opinion expresses concern that foreign litigants will flock to the United States for redress of their injuries in distant lands. The majority opinion, and the district court opinions it cites, seem to fear that the interpretation of the FTAIA that Statoil advocates makes the Sherman Act an antitrust regulation of foreign economies throughout the entire world, a paternalistic lawmaking enterprise that ignores the adequacy of foreign tribunals. But Congress has enacted no such thing. Congress enacted the FTAIA to serve the United States’ narrow interest in vigorous domestic competition.
The text of the FTAIA may be inelegant, but it serves the selfish national in *439 terests of the United States: the FTAIA excludes from antitrust liability all conduct that has caused no antitrust injury to the United States economy;[36] but it enlists all injured parties — foreign or domestic — to assist the Department of Justice in deterring conduct that does harm the forces of competition in the United States. When a conspiracy causes a direct and substantial injury to competition in the United States, the Clayton Act recruits private parties to supplement the efforts of the Department of Justice in ending the conspiracy. The FTAIA ensures that parties injured by foreign aspects of the same conspiracy that harms American commerce are part of the phalanx of enforcers brought to bear by the Clayton Act. Thus, treble damages suits by parties who suffer antitrust injury from a conspiracy that has a direct and substantial harmful impact on United States commerce serve a single function: the protection of United States commerce. The FTAIA threatens no parade of horri-bles — it does nothing more than zealously protect competition in the United States while sparing from the docket of American courts suits involving conspiracies that affect only foreign economies.
In sum, I believe the FTAIA does not divest the federal courts of jurisdiction over suits by plaintiffs who suffer antitrust injuries from a conspiracy that also harms competition in United States commerce. Whether the harm felt in the United States is the source of the injury to the plaintiff is irrelevant; it is the effects on the United States that creates jurisdiction. Under the facts of this case, I would conclude that the district court had jurisdiction over the suit and that Statoil had standing to sue the defendants under the Clayton Act. I respectfully dissent.

. 15 U.S.C.A. § 6a (1997).

. For brevity, I herein refer to the effects required by section 6a(l) as effects on "United States commerce.”

. 15 U.S.C. § 6a(2) (emphasis added).

. The effect must cause "antitrust injury.” The “effect” described by section 6a(l) can be beneficial, neutral, or injurious. Section 6a(2) requires that this effect be injurious and, further, that the injury be caused by reduced, not increased, competition.

. Courts will not presume that statutory language is redundant or surplusage. The majority’s interpretation, however, makes the proviso at the end of section 6a redundant. Section 6a(l)(B) states that the Sherman Act applies to conduct with effects on "export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States.” The proviso limits the applicability of the Sherman Act under section 6a(l)(B) "to such conduct only for injury to export business in the United States .” Thus, while (1)(B) requires only that the conduct affect a person engaged in export trade in the United States, the proviso limits recoveiy under the Sherman Act to such persons. The majority's reading of 6a(2) renders this proviso redundant, since it requires that the effect on the exporter in the United States "give[ J rise to” the plaintiff's claim — in other words, that the person engaged in export trade be the plaintiff.

. Courts have long held that private plaintiffs "must prove the existence of ‘antitrust injury’ " to recover under section 4 of the Clayton Act. Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). In Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court noted that the plaintiffs "must show that the conspiracy caused them an injury for which the antitrust laws provide relief.” Id. at 584 n. 7, 106 S.Ct. 1348. The Court explained that a "cognizable injury” is an "antitrust injury.” Id. at 586, 106 S.Ct. 1348.

. The Clayton Act requires that the plaintiff suffer antitrust injury. The FTAIA, by contrast, requires that the United States suffer antitrust injury. Compare Clayton Act, 15 U.S.C.A. § 15(a) (providing.cause of action to anyone "injured in his business or property by reason of anything forbidden in the antitrust laws”) (emphasis added), with FTAIA, 15 U.S.C.A. § 6a(2) ("gives rise to a claim under the [Sherman Act]”) (emphasis added). When a private plaintiff wishes to sue under the Clayton Act, the Clayton Act and FTAIA erect complementary requirements: the plaintiff must suffer antitrust injury, and persons in United States commerce must suffer antitrust injury. The majority opinion, on the other hand, appears to conflate these two concepts.

. Export Trading Company Act of 1982, Pub.L. No. 97-290, 96 Stat. 1233 (codified in scattered sections of 15 U.S.C.).

. Export Trading Company Act of 1982 § 102, 96 Stat. at 1233-34.

. § 102(b), 96 Stat. at 1234. The Third Circuit has recently cited this language in concluding that "Congress enacted the FTAIA for the purpose of facilitating the export of domestic goods by exempting export transactions that did not injure the United States economy from the Sherman Act and thereby relieving exporters from a competitive disadvantage in foreign trade.” Carpet Group Int’l v. Oriental Rug Importers Ass’n, Inc., 227 F.3d 62, 71 (3d Cir.2000).

. Because the language of the statute is clear, we need not resort to its legislative history to discern its purpose. In any case, the legislative history only reiterates this single, motivating purpose. See H.R.Rep. No. *434 97-686, 97th Cong., 2d Sess., reprinted in 1982 U.S.C.C.A.N. 2487, 2487 (describing the legislation as "the bill ... to exclude from the application of [the antitrust laws] certain conduct involving exports" and "one of several bills ... that seek to promote American exports”). The excerpt of legislative history upon which the majority relies, that the purpose of the law is "to more clearly establish when antitrust liability attaches to international business activities," is certainly a true statement, but it expresses the purpose of the law at a level of generality that offers us no guidance on the narrow question we face. What the majority has overlooked is that Congress has spoken with much more particularity as to the purpose of this law: the purpose of the FTAIA is to promote exports by exempting American exporting activity from the antitrust laws.

. This cannot seriously be disputed. The FTAIA does not alter the holding of Pfizer, Inc. v. Government of India, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978), which allowed foreign governments to sue an American cartel that charged supra-competitive prices for pharmaceuticals worldwide. The legislative history approves of Pfizer. See H.R.Rep. No. 97-686, reprinted in 1982 U.S.C.C.A.N. 2487, 2495.

. 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

. Id. at 745-46, 97 S.Ct. 2061, quoting id. at 760, 97 S.Ct. 2061 (Brennan, J., dissenting).

. 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978).

.Because of this, Pfizer is distinguishable from this case, since one can argue, as the majority does, that the injury to the foreign plaintiff occurred, in the United States. But there is nothing in the reasoning of Pfizer that suggests that the facts of Pfizer define the outer limit of the antitrust laws. Further, even if we assume that the plaintiffs in Pfizer were injured in the United States, they were injured as buyers in an export transaction from the United States. Under section 6a(l)(B) and the majority's reading of the section 6a(2), injuries to buyers of American exports do not create jurisdiction under the antitrust laws. Yet the legislative history of the FTAIA cites Pfizer with approval. Pfizer maintains its force after the FTAIA because the conspiracy in Pfizer also affected Americans in domestic commerce. This is why section 6a(2) states "gives rise to a claim” and not "gives rise to the plaintiff's claim.”

. Id. at 314-15, 98 S.Ct. 584.

. For a real-life example of an arbitrage attempt, see Eurim-Pharm GmbH v. Pfizer, Inc., 593 F.Supp. 1102, 1104 (S.D.N.Y.1984) (describing how antitrust plaintiff attempted to arbitrage pharmaceuticals by repackaging drugs purchased in England for sale in Germany).

. 434 U.S. at 315, 98 S.Ct. 584 (footnote omitted).

. H.R.Rep. No. 97-686, 97th Cong., 2d Sess., reprinted in 1982 U.S.C.C.A.N. 2487, 2495 (emphasis in original), citing Pfizer, Inc. v. Government of India, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978).

. Id. at 2494-95.

. Id. ("Such foreign transactions should, for the purposes of this legislation, be treated in the same manner as export transactions — that is, there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect on domestic commerce or a domestic competitor.”).

. 148 F.3d 1080 (D.C.Cir.1998).

. Id. at 1086.

. See Majority Op. at 426 n. 18.

. Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) ("[I]t is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States.”).

. See, e.g., United States v. Lopez, 514 U.S. 549, 552-59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (recounting the development of Commerce Clause jurisprudence in the domestic context).

. See Majority Op. at 423-24.

. See E.E.O.C. v. Arabian American Oil Co., 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ("This 'canon of construction ... is a valid approach whereby unexpressed congressional intent may be ascertained .' ... In applying this rule of construction, we look to see whether 'language in the [relevant Act] gives any indication of a congressional purpose to extend its coverage [extraterritorially].' ").

.In any case, when Congress enacted the FTAIA, is was legislating against a backdrop of extraterritorial application of the Sherman Act; thus we cannot presume that Congress treated non-extraterritoriality as the default condition. See Hartford Fire Ins., 509 U.S. at 796, 113 S.Ct. 2891 ("[I]t is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States ."); id. at 814, 113 S.Ct. 2891 (Scalia, ,T., dissenting) ("[I]t is now well established that the Sherman Act applies ex-traterritorially.”); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582 n. 6, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 704, 82 S.Ct. 1404, 8 L.Ed.2d 111 (1962).

. Doctor’s Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc., 123 F.3d 301, 305 (5th Cir.1997). For further discussion, see McCormack v. NCAA, 845 F.2d 1338, 1341 (5th Cir.1988); see also Associated General Contractors of California v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

. Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), quoting Brunswick, 429 U.S. at 489, 97 S.Ct. 690.

. See Atlantic Richfield, 495 U.S. at 334, 337-38, 110 S.Ct. 1884; Brunswick, 429 U.S. at 488-89, 97 S.Ct. 690.

. Appellees rely heavily on the antitrust injury requirement in arguing that Statoil lacks standing. Their argument that Statoil’s injury was not caused by high prices charged to U.S. consumers misconstrues the antitrust injury requirement. Antitrust injury does not limit standing to U.S. consumers but to anti-competitive injuries. See Doctor's Hospital, 123 F.3d at 305-06; see also Blue Shield of Virginia v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).

. McCormack, 845 F.2d at 1341.

. Indeed, the fact that the FTAIA protects American exporters from antitrust liability for conduct that restrains export trade indicates that the FTAIA is not concerned with regulating foreign economies.